# EXHIBIT B-RAWLINS AFFIDAVIT

AFFIDAVIT

I, Michael E. Rawlins, being duly sworn, hereby depose and say:

A. INTRODUCTION

1. I have been a special agent with the Federal Bureau of Investigation (FBI) for over four years. Prior to my employment with the FBI, I was employed for approximately four years as a special agent with the Department of Defense. For the past eight years I have been assigned to white collar crime investigations, and during that time I have conducted numerous investigations related to bank fraud, mail fraud, and money laundering. Many of these investigations have involved property flip schemes whereby real estate professionals purchase properties at one price and then simultaneously sell (or "flip") the same piece of property for a significantly higher price to a straw borrower. In order to obtain mortgage loans for the straw borrowers the real estate professionals fabricate income and credit-related documentation which is included in the corresponding loan packages. These fraudulent loan packages are ultimately submitted to victim lenders who unknowingly fund the fraudulent loans. Very few mortgage payments are ever made on the loans, resulting in numerous foreclosures and tremendous financial losses to the lenders. Since September of 2000, I have been assigned to investigate James Bennett, who has been engaged in an elaborate property flipping scheme.

06 1635
FILED
SEP 21 2006
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

B.  PURPOSE OF AFFIDAVIT

2. I make this affidavit in support of search warrants for the following premises (more fully described in Attachment A to each search warrant), each of which contains records of a business so permeated by fraud based on all of the information which has been obtained during the course of this investigation, some of which is contained in this affidavit, that all records sought are likely to be evidence of criminal activity, and legitimate transactions cannot be separated from fraudulent ones without significant analysis which is not possible during the course of the search. I believe that each of these premises contain the fruits, instrumentalities and evidence specified in Attachment B to each search warrant of violations of Bank Fraud (18 U.S.C. Sec. 1344):

   a. West Belle Mortgage/Real Estate/Escrow, 6200 East Canyon Rim, #211E, Anaheim Hills, CA;

   b. James Bennett's residence, 5565 Blue Ridge Dr., Yorba Linda, CA

C.  SUMMARY OF FRAUDULENT SCHEME

3. James Bennett and others (the "targets") have purchased and then resold ("flipped") dozens of residential properties to straw borrowers (or qualifiers). A straw borrower, or qualifier, is an individual who purchases property using false loan documents provided by the targets, including false income, employment, net worth, and down payment information. Most of these flips involve double escrows in which a property is bought

by the targets and then sold simultaneously at an inflated price. The inflated price is at times more than twice the original purchase price paid by the targets. The targets use friends and family members to act as the qualifiers. In order to secure mortgage loans for the qualifiers, the targets have submitted dozens of false loan packages in the Los Angeles and Orange County areas. Utilizing Bennett's different companies, the targets act as the real estate agent, loan officer, escrow officer, and appraiser on most of the transactions. After the fraudulently obtained loans are funded, the qualifiers fail to make the corresponding mortgage payments and the victim lenders incur losses in excess of $100,000 per property.

4. More specifically, in many cases the targets would prepare two settlement statements -- one showing a sale at the actual sales price to one of their associates, and the other showing a sale at an inflated price to a straw borrower. Using fraudulent asset and income documentation and appraisals, the targets would obtain a mortgage loan for the straw borrower to purchase the property at the inflated price. The targets would provide the settlement statement showing the lower (or true) sales price to the seller of the property, and the settlement statement showing the inflated sales price to the mortgage lender. This would enable the targets to obtain mortgage loans well in excess of the actual purchase price of the properties.

D.   FACTS ESTABLISHING PROBABLE CAUSE

5.   In January 2002 I received three loan files from Flagstar Bank which related to property flips orchestrated by the targets. Flagstar incurred over $470,000 in monetary losses as a result of these three fraudulent transactions. The three transactions share common characteristics in that the same real estate agent, mortgage broker, escrow officer, and appraiser are used for each of the three loans. The real estate company (West Belle Realty), escrow company (West Belle Mortgage Escrow), and property appraisal company (Value Seekers) are all owned by Bennett. I learned that Bennett is the owner of these companies by interviewing former employees and by reviewing bank signature cards which list Bennett as being either the president or owner of the subject companies. Value Seekers was listed on the bank signature card as being a D.B.A. for Bennett. The mortgage broker, Donna Simon, who originated all three loans, is a former employee of West Belle Mortgage. The corresponding property addresses related to these three flips are as follows: 1. 768 E. 43rd St., Los Angeles, CA; 2. 1412 W. 94th St., Los Angeles, CA; and 3. 2121 Atlantic Ave., Long Beach, CA.

   a.   768 E. 43rd Street, Los Angeles, CA

1.   A review of Flagstar's loan package, which was brokered to Flagstar by Donna Simon, revealed the following false statements related to the property transaction:

      i.   The settlement statement from Bennett's escrow company (West Belle Mortgage Escrow) revealed the seller

4

of the property to be Alfredo Chavez and the buyer to be William Rogers. According to the settlement statement Chavez sold the subject property to Rogers on 09/17/1999 for $275,000. An interview of Alfredo Chavez disclosed that on or about the same date (09/17/99) Chavez sold the property to Jeannette Brown (not Rogers), for $172,500. Jeannette Brown is Bennett's mother. Chavez provided his corresponding settlement statement (also from West Belle Mortgage Escrow) which fully supported Chavez's assertion regarding the true buyer and actual sale's price.

      ii. A copy of a grant deed dated 08/31/1999 purports to show the granting of the property from Chavez to Rogers. This deed is certified true by West Belle's escrow officer Ricardo Garcia. A review of the true recorded grant deed shows title passing from Chavez to Brown and not to Rogers. A comparison of the two deeds clearly shows that the true deed has been altered (i.e. "Brown" changed to "Rogers") in an effort to conceal the property flip.

      iii. The residential loan application states that Rogers was employed at Marktel Communications earning a monthly income of $6,695. The loan package contains W-2s and pay stubs corresponding with this reported income. A review of official IRS records (IRS Form 4506), obtained by Flagstar with Rogers' authorization, disclosed that Rogers had no reported earnings for the time period in question.

      iv. The residential appraisal dated 08/05/1999 and purportedly prepared by Greg Bales, Bennett's

5

employee and brother-in-law, estimated the market value of the property to be $275,000. This appraisal appears to be inflated as the actual sales price of the property was $172,500.

b. <u>1412 W. 94th Street, Los Angeles, CA</u>

    1. A review of Flagstar's loan package revealed the following false statements related to this property transaction.

        i. The settlement statement from West Belle Mortgage Escrow revealed the seller of the property to be Howard Wilhite and buyer to be Rebecca Fernandez, wife of West Belle loan officer Bernard Fernandez. According to the settlement statement Wilhite sold the subject property to Fernandez on 08/20/1999 for $280,000. An interview of Wilhite disclosed that on or about the same date (08/20/99) Wilhite sold the property to Pamela Woodward, Bennett's wife, (not Fernandez), for $180,000. Wilhite provided his corresponding settlement statement (also from West Belle Mortgage Escrow) which fully supported his assertion regarding the true buyer and actual sale's price of the property.

        ii. A copy of a grant deed dated 08/05/1999 purports to show the granting of the subject property from Wilhite to Fernandez. This deed is certified true by West Belle's escrow officer Ricardo Garcia. A review of the true recorded grant deed shows title passing from Wilhite to Woodward and not to Fernandez. A comparison of the two deeds clearly shows that the true deed has been altered (i.e. "Woodward"

changed to "Fernandez") in an effort to conceal the property flip.

iii. The residential loan application states that Fernandez was employed at Tressc Communications and that during 1998 she earned over $92,000 in income. The loan package contains W-2s and pay stubs corresponding with this reported income. A review of official IRS records (IRS Form 4506), obtained by Flagstar with Fernandez's authorization, disclosed that Fernandez and her husband had $24,620 in reported income for 1998.

iv. The residential appraisal dated 06/30/1999 and purportedly signed by Greg Bales estimated the market value of the property to be $280,000. This appraisal appears to be inflated as the actual sales price of the property was $180,000.

c. <u>245 W. 56th Street, Long Beach, CA</u>

1. A review of Flagstar's loan package which was also brokered by Simon revealed several false statements related to the transaction.

i. The settlement statement from West Belle Mortgage Escrow revealed the seller of the property to be Santa Monica Bank, and the buyer to be Arturo Vargas. According to the settlement statement Santa Monica Bank sold the subject property to Vargas on 08/10/1999 for $285,000. A review of public records disclosed that Santa Monica Bank actually sold the property for $180,000 to Gregory Wright, Bennett's step son. According to

public records, Wright then sold the property to Vargas for $285,000.

    ii. A copy of a grant deed dated 07/15/1999 purports to show the granting of the property from Santa Monica Bank to Vargas. This deed is certified true by West Belle's escrow officer Ricardo Garcia. A review of the true recorded grant deed shows title passing from Santa Monica Bank to Wright and then from Wright to Vargas. Once again the deed submitted to Flagstar has been altered in an apparent attempt to conceal the property flip.

    iii. The residential loan application claims that Vargas was employed at Caretex Industries and that during 1998 he earned over $86,000. The loan package contains W-2s and pay stubs corresponding with this level of income. A review of official IRS records (IRS Form 4506), obtained by Flagstar with Vargas' authorization, disclosed that during 1998 Vargas had $24,187 in reported income.

    iv. The residential appraisal dated 06/30/1999 and purportedly prepared by Greg Bales estimated the market value of the property to be $285,000. The appraisal appears to be inflated as the actual sales price of the property was $180,000.

6. In addition to these three transactions I have reviewed numerous others which involve illegal property flips perpetrated by the targets. Property records show that the same straw borrowers (i.e. Rogers, Fernandez, and Vargas) were used as

qualifiers on several other transactions as well. In add: these three qualifiers I have identified at least 12 other individuals who have acted as straw borrowers, each purchasing multiple properties from the targets. All of these transactions share some (or all) of the characteristics described above. The mortgage loans related to these transactions contain fraudulent information that has been submitted to a number of different mortgage lenders. The total loss to these lenders (and others not currently known) could easily be in excess of several million dollars. A review of public record data bases revealed that the targets have been involved in property flipping since January of 1995.

7. On 03/21/2002 I spoke with Gregory Bales who agreed to assist with the investigation. Bales advised that he is Bennett's brother-in-law (i.e. Pamela Bennett's brother) and has also been an employee of Bennett's appraisal company, Value Seekers, for several years. Bales advised that Bennett, acting as his supervisor, regularly inflated the appraised values of properties that Bales had reviewed. From 1994 through 2001, Bales had a full-time job at an unrelated company and therefore only did appraisal work for Bennett on the weekends. During this time period Bennett continued operating his appraisal business full-time by doing the appraisal work himself and then signing Bales' name to the official appraisals. Bales further advised that the business records related to the [fraudulent] appraisals and the corresponding property flips are stored at Bennett's West

9

Belle office located at 6200 East Canyon Rim, Anaheim Hills, CA, and at his personal residence located at 5565 Blueridge Drive, Yorba Linda, CA.

8. On 02/19/2002 I spoke with a cooperating witness (CW) who was in the business of fabricating income and credit-related documentation for real estate professionals. The CW was paid for his/her services by the real estate professionals who would use the fraudulent documents to enable unqualified or straw borrowers to qualify for mortgage loans. The CW advised that from 1996 through 1999 loan officers at West Belle Mortgage regularly purchased bogus documents from him/her which they then included in their respective loan files. These bogus documents included IRS Form W-2s, pay stubs, credit letters, and bank statements.

9. On April 5, 2002, I called Flagstar Bank and was informed that the deposits of Flagstar are insured by the Federal Deposit Insurance Corporation.

E. ITEMS TO BE SEIZED

10. Based upon my own and other investigators' experience in investigating fraud cases, including real estate loan fraud, I have found that individuals and businesses engaged in fraudulent activities commonly keep records, financial documents, correspondence, memoranda, notes, and other documents and records related to the fraudulent activity in desks, drawers, file cabinets, safes, vaults, boxes, or other document storage facilities on their business premises and in their residences. Furthermore, persons involved in fraudulent activity may often

conceal evidence in briefcases, purses, or otherwise on their person during execution of a search warrant. These individuals may try to remove potentially incriminating evidence on their person when permitted to leave the premises.

11. It has also been my experience that business entities typically maintain some form of record keeping system wherein the entity retains custody of its business records, financial records, and other records and documents pertaining to the business for several years.

<u>6200 East Canyon Rim, #211E, Anaheim Hills, CA</u> and
<u>5565 Blue Ridge Drive, Yorba Linda, CA</u>

12. The business offices at 6200 East Canyon Rim, #211E, Anaheim Hills, CA, used by James Bennett, Pamela Bennett, and other unknown individuals and the residence at 5565 Blue Ridge Drive, Yorba Linda, CA, are to be searched for evidence of bank fraud, mail fraud, and money laundering. These locations are described in further detail in Attachment A to the respective search warrants. These premises are to be searched for the following documents, records, and tangible items:

   a. Loan packages, loan files, loan applications, financial statements, promissory notes, appraisals of real property, verifications of deposit, verifications of employment, pay stubs, and loan payment records, related to real estate loans dated January 1, 1995 to present;

   b. Escrow files, real estate sales contracts, deeds of trust, title records, title policies, lease agreements and any

11

documents referring or relating to escrow companies, title companies, real estate brokers, borrowers, and lending institutions, related to real estate loans dated January 1, 1995 to present;

   c. Correspondence regarding funded and unfunded loan transactions, including, but not limited to, correspondence with lenders, banks, mortgage brokers, credit unions, and savings and loans, internal correspondence, notes, memoranda, and journals dated January 1, 1995 to present;

   d. All financial records and records of any accounts (dated January 1, 1995 to present) held by West Belle Mortgage, Value Seekers, West Belle Mortgage Escrow, West Belle Realty (hereafter referred to as the subject companies), and James Bennett, Pamela Bennett (a.k.a. Pamela Woodward), Gregory Wright, and Jeannette Brown (hereafter referred to as the targets), including, but not limited to account statements, signature cards, checks, canceled checks, checkbooks, check registers, deposit and withdrawal records, records relating to incoming and outgoing wire transfers, money orders, debit and credit memos, and any other documents that reflect the receipt and disbursement of funds;

   e. Any correspondence, memoranda, notes, facsimiles and cover sheets, related to mortgage loans or to the subject companies or targets dated January 1, 1995 to present;

   f. Any documents, records, or tangible items relating to the financial condition, income and expenses, and assets and

liabilities of borrower applicants, including, but not limited to, tax returns, statements from financial and brokerage institutions, requests for verification of deposits, and requests for verification of employment dated January 1, 1995 to present;

g. Accounting ledgers, disbursement journals, general ledgers, cash registers, and cash journals of the subject companies or targets from January 1, 1995 to the present;

h. Any documents, records, and tangible items relating to any commissions or fees earned from January 1, 1995 to the present;

i. Personnel records identifying current and former employees of subject companies dated January 1, 1995 to present;

j. Notes, letters, memoranda, written policies, facsimile documents, rental agreements, or other documents that refer or relate to the use of post office boxes, offsite storage locations, and safe deposit boxes dated January 1, 1995 to present;

k. Records of occupancy at addresses listed above as premises to be searched dated January 1, 1995 to present;

l. Records evidencing dominion and control over the premises to be searched dated January 1, 1995 to present;

    m. Articles of incorporation, partnership agreements, corporate minute books, partnership and/or corporate meeting records relating to subject companies from January 1, 1995 to present.

                                      _____
                                      Michael E. Rawlins
                                      Special Agent, FBI

Subscribed and sworn to by me this __5__ day of April, 2002

_____
United States Magistrate Judge

14